**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                 :

SURENDRA PAI, NEXDRX1 LLC, AND   :
NEXETRA CORP.,

                                   :

      Plaintiffs,             :     Civil Action No. 13-4333 (JAP) (TJB)

                                   :

              v.                 :

                                   :

DRX URGENT CARE, LLC, AMERICAN  :
FAMILY CARE, RHINO 7 FRANCHISE   :
DEVELOPMENT CORPORATION,      :
JOHN DOES 1-10, and                 :
ABC CORP. 1-10M,                 :

                                   :

      Defendants.            :
_____:

                                   :

LAURA FABBRO,                  :
DRX HAMILTON, LLC, FABBRO      :
ENTERPRISES, LLC, and FABBRO     :
FINANCIAL MANAGEMENT, INC.    :

                                   :

      Plaintiffs,            :     Civil Action No. 13-3558 (JAP) (LHG)

                                   :

              v.                 :     **OPINION**

                                 :

DRX URGENT CARE, LLC, AMERICAN  :
FAMILY CARE, JOHN DOES 1-10, and  :
ABC CORP. 1-10M,                 :

                                   :

      Defendants.            :
_____:

PISANO, District Judge.

      Plaintiff NEXDRX1, of *Pai v. DRX Urgent Care, LLC*, Civil Action No. 13-4333, is a

franchisee of the Doctors Express franchise system, of which Defendant American Family Care

is the current franchisor.  Plaintiff Surendra Pai is the principal owner of both NEXDRX1 and

Nexetra Corp. (collectively, the "Pai Plaintiffs").  Together, they bring suit against Defendants

DRX Urgent Care, LLC, American Family Care, Rhino 7 Franchise Development Corporation,

John Does 1-10, and ABC Corp. 1-10M (the "Defendants"), alleging various contract and tort

claims against Defendants.

Similarly, Plaintiff Laura Fabbro ("Fabbro"), of *Fabbro v. DRX Urgent Care, LLC*, Civil

Action No. 13-3558, is a franchisee of the Doctors Express franchise system, of which

Defendant American Family Care is the current franchisor.  The remaining Plaintiffs are entities

set up by Fabbro to provide various services to Fabbro's Doctors Express urgent care center

(collectively, the "Fabbro Plaintiffs").  Together, they bring suit against Defendants DRX Urgent

Care, LLC, American Family Care, John Does 1-10, and ABC Corp. 1-10M (the "Defendants").

The Complaints brought by both the Pai and Fabbro Plaintiffs (together, "Plaintiffs") are

nearly-identical Complaints involve the same franchisor, the same franchising system, and

identical claims against the same defendants.  Indeed, the Plaintiffs have retained the same

counsel, who have drafted (except for a few factual issues personal to each Plaintiff) identical

Complaints.[1]  Currently before the Court are two motions to dismiss, filed in each action,

brought by the same Defendants.  Because Defendants have filed motions to dismiss based upon

the same legal reasoning, the Court will address and determine the two pending motions

simultaneously.

 Therefore, before the Court are Defendants' Motions to Dismiss pursuant to Fed. R. Civ.

P. 12(b)(6), or, in the alternative, Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56

[*Pai v. DRX Urgent Care, LLC*, Civil Action No. 13-4333, ECF No. 6; *Fabbro v. DRX Urgent*

---

[1] Indeed, in *Pai*, the Complaint contains two sets of paragraphs numbered 47-60.  The paragraph numbers revert to "47" in Count 1, after paragraph 60, indicating that the paragraphs in the Counts sections were cut and pasted directly from the *Fabbro* Complaint without even changing the numbering  This is particularly relevant here, where the Court is faced with motions to dismiss based upon these claims.

*Care, LLC*, Civil Action No. 13-3558, ECF No. 5]. Plaintiffs oppose these motions. The Court decides these matters without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court will grant Defendants' Motion to Dismiss in both cases.

## I.     Background

Plaintiff Surendra Pai ("Pai") is the principal owner of both NEXDRX1 and Nexetra Corp. Pai Compl. ¶ 7. Plaintiff NEXRIX1, LLC ("NEXDRX1") is a Doctors Express franchisee, having executed a Doctors Express franchise agreement (the "Franchise Agreement") on February 12, 2010. Pai Compl. ¶¶ 8-9, 17. NEXDRX1 is the only Plaintiff that signed the Franchise Agreement, and the Franchise Agreement identifies only NEXDRX1 as the franchisee. Under the Franchise Agreement, NEXDRX1 has the right to operate an urgent care facility in Florham Park, New Jersey using the Doctors Express marks, system, and operations manuals for a period of fifteen years. *See* Pai Compl. Ex. A at § 1.1. NEXDRX1 purchased its Doctors Express franchise in February 2010 from the franchisor at that time, Doctors Express Franchising, LLC ("DEF"). DEF is not a party to this case. NEXDRX1 is currently operating its Doctors Express Franchise. *See* Pai Compl. ¶ 18.

Plaintiff Laura Fabbro ("Fabbro") is a Doctors Express franchisee, having executed the same Doctors Express franchise agreement (the "Franchise Agreement") on April 9, 2009. Fabbro Compl. ¶ 4; Fabbro Compl. Ex. A. Fabbro is the only Plaintiff that signed the Franchise Agreement, and the Franchise Agreement identifies only Fabbro as the franchisee. Under the Franchise Agreement, Fabbro has the right to operate an urgent care facility in Hamilton, New Jersey using the Doctors Express marks, system, and operations manuals for a period of fifteen years. *See* Fabbro Compl. Ex. A at § 1.1. Fabbro purchased her Doctors Express franchise in April 2009 from the franchisor at that time, Doctors Express Franchising, LLC ("DEF"). DEF is

3

not a party to this case.  Fabbro is currently operating its Doctors Express Franchise. *See* Fabbro Compl. ¶ 11.

The Franchise Disclosure Document

Prior to executing a franchise agreement with DEF in 2012, the Pai Plaintiffs were furnished a copy of the May 15, 2009 DEF Franchise Disclosure Document (the "Pai FDD") and form franchise agreement.  According to the Pai FDD, the initial start-up costs and capital contribution required would cost within the range of $466,220 to $612,720.  Defendants specifically maintained that the sum of $50,000 to $90,000 was a sufficient sum to support operating capital for the three months following the opening of a franchisee's location.  *See* Pai Compl. ¶ 21.

Likewise, prior to executing a franchise agreement with DEF in 2009, the Fabbro Plaintiffs were furnished a copy of the December 16, 2009 DEF Franchise Disclosure Document (the "Fabbro FDD") and form franchise agreement.[2]  According to the Fabbro FDD, the initial start-up costs and capital contribution required would cost within the range of $463,000 to $594,000.  Defendants specifically maintained that the sum of $50,000 to $90,000 was a sufficient sum to support operating capital for the three months following the opening of a franchisee's location.  *See* Fabbro Compl. ¶ 13.

The FDD, however, makes clear that the costs included within the FDD are estimates only, and not a projection or promise of the actual costs of the franchise.  Specifically, the FDD states:  "In compiling these estimates, we have relied on the experience and data collected from our affiliate that operates an urgent care center (in Maryland).  Your costs will depend on a number of factors including local economic and market conditions."  Declaration of Regina B.

---

[2] The Fabbro Plaintiffs erroneously refer to the FDD as a "Uniform Franchise Offering Circular" or UFOC.  In 2007, however, the Federal Trade Commission amended its rule and started referring to these documents as FDD as opposed to UFOC.

Amolsch ("Amolsch Decl.") Ex. A [hereinafter, the "Pai FDD"] at 14; *see also id.* at 43

(indicating that the financial performance representations were estimates and "should not be

considered a representation or guaranty"); Declaration of Chad A. Keetch ("Keetch Decl.") Ex.

A [hereinafter, the "Fabbro FDD"] at 13; *see also id.* at 41 (indicating that the financial

performance representations were estimates and "should not be considered a representation or

guaranty").  As the quoted section indicates, the FDD also makes clear that there were no

currently operating franchised units.  Rather, there was only one other Doctors Express center in

existence at the time, and it was owned by a DEF affiliate, not by a DEF franchisee.  *See* Pai

FDD at 14, 44-46; Fabbro FDD at 13, 38-41.

      The FDD also contained financial performance representations.  *See* Pai FDD at 40-41;

Fabbro FDD at 38-41.  In the 2009 Pai FDD, this representation provided the gross revenue and

cost data for the one operating Doctors Express center in Towson, Maryland (near Baltimore).

The section specifies that this operating Doctors Express center was owned by a doctor and

includes his salary in the cost data for that existing location.  *See* Pai FDD at 41-42.  The 2008

Fabbro FDD also discloses the gross revenue and cost data for the one operating Doctors Express

center in Towson, Maryland (near Baltimore).  This section discloses that the center was owned

by a doctor and therefore did not incur that salary cost, but provides estimates for a staff

physician.  *See* Fabbro FDD at 39-40.

<u>The NEXDRX1 Franchise Agreement</u>

      Plaintiff NEXDRX1 signed the Franchise Agreement with DEF on February 12, 2010.

As discussed, Plaintiff Fabbro signed her Franchise Agreement with DEF on April 9, 2009.  The

only real factual differences between these cases relate to the NEXDRX1 Franchise Agreement.

Specifically, unlike the Fabbro Plaintiffs, the Pai Plaintiffs selected a site for their Doctors

5

Express center that then-franchisor DEF advised against because of its concern that opening at that site could "negatively impact [its] business. . . ."  Pai Compl. Ex. A at Sept. 9, 2011 letter. The only other difference is that, while both Franchise Agreements contain a covenant against competition, the Pai Plaintiffs negotiated two amendments to the Franchise Agreements that impacted this covenant.

First, under the terms of the Franchise Agreement, Plaintiffs had the obligation to acquire a site for their Doctors Express franchise in accordance with certain procedures set forth in an addendum to the Franchising Agreement and subject to the approval of DEF.  *See* Pai Compl. Ex. A at § 2.1; Fabbro Compl. Ex. A at § 2.1.  The Site Selection Addendum to the Pai Franchise Agreement indicated that the franchise should be located within the area of Newark, New Jersey and Wilkes-Barre, Pennsylvania.  *See* Pai Comp. Ex. B to Ex. A.  The site where Plaintiff NEXDRX1 proposed to open its franchise did not meet DEF's criteria for new Doctors Express Urgent Care locations.  NEXDRX1 wanted to move forward with its proposed location, in Florham Park, regardless.  Defendant DEF put its objections in writing in a September 9, 2011 letter, in which it authorized the execution of a lease for the Florham Park site.  DEF stated that the location and "certain aspects of the proposed lease and/or operating and financial characteristics of the location, do not satisfy our standards for new Doctors Express Urgent Care locations."  It further went on to explain that its acceptance of the location and lease was not a "guaranty, warranty or representation that the Proposed Location, the urgent care center, or the franchised business will be successful or will generate any particular level or amount of sales, revenue or profit."  DEF then reiterated that it had "advised [NEXDRX1] that opening and operating at the Proposed Location can . . . negatively impact [its] business, increase [its] costs, [its] patient flow and [its] revenues."  NEXDRX1 expressly acknowledged these warnings in

writing, at which time DEF withdrew its objections and permitted NEXDRX1 permission to open its franchise at the Florham Park site.  *See* Pai Compl. Ex. A at Sept. 9, 2011 letter.

Next, the Franchise Agreement also contains sections regarding covenants not to compete if the Franchise Agreement is terminated.  The covenant not to compete mandates that NEXDRX1 cannot operate a "competitive business," as defined under the Franchise Agreement, for a period of two years within five (5) miles of the border of NEXDRX1's "territory."  *See* Pai Compl. Ex. A at § 15.4.  Plaintiffs sought and obtained two modifications to this covenant.  On February 10, 2010—the same day the Franchise Agreement was executed—the parties also executed an amendment to the Franchise Agreement because the "Franchisee has requested certain revisions to the Franchise Agreement between the Franchisor and Franchisee. . . ."  Compl. Ex. A at First Amendment.  One of the revisions made was a narrowing of the term "competitive business" in Section 7 of the Franchise Agreement, which also applies to the covenant found in Section 15.  *See id.*  Thereafter, on November 9, 2010, the parties executed a second amendment to the Franchise Agreement.  This second amendment once again narrowed the definition of the term "competitive business."  It also reduced the geographic scope of the covenant with respect to physician owners of the business to ten (10) miles from the Florham Park site itself.  *See* Pai Compl. Ex. A at Second Amendment.

Ownership of DEF and the Doctors Express system

In March 2012, Defendant DRX Urgent Care, LLC ("DRX") acquired the assets of the Doctors Express system from DEF.  Pai Compl. ¶ 10; Fabbro Compl. ¶ 8.  This transaction included the assignment of the Doctors Express franchise agreements to DRX from DEF as part of the asset sale.  *See id.*; Amolsch Decl. ¶ 2.  This assignment of the Franchise Agreement and changing or ownership to a third party was reserved without restriction in the Franchise

Agreement.  *See* Pai Compl. Ex. A at § 12.1; Fabbro Compl. Ex. A at § 12.1.  DRX had no involvement in the Doctors Express franchising system prior to 2012.

According to the Complaint, Dr. John Shufeldt became the Chief Executive Officer (CEO), and oversaw the Doctors Express system.   Pai Compl. ¶¶ 34-35, 40; Fabbro Compl. ¶¶ 25-26; 31.  Prior to his involvement with DRX and the Doctors Express system, Dr. Shufeldt was the founder, Chairman of the Board, and CEO of NextCare Inc.  Pai Compl. ¶ 35; Fabbro Compl. ¶ 26.  NextCare, which is also an urgent care provider, had been under investigation by the United States Department of Justice regarding years of allegedly fraudulent health care billing transactions, purportedly resulting in fraudulent overbilling to Medicare, five Medicaid programs, and TRICARE.  On or about July 2012, NextCare paid $10 million to settle these allegations.  Pai Compl. ¶ 36; Fabbro Compl. ¶ 27.  According to the Complaint, the settlement announcement between NextCare and the DOJ and "Shufeldt's acquisition of the Doctor's Express franchise were nearly contemporaneous and were covered by the mainstream media during the same general time period."  Pai Compl. ¶ 40; Fabbro Compl. ¶ 31.  After six months as CEO, Dr. Shufeldt voluntarily resigned from the position; according to Plaintiffs, "DRX maintains that Dr. Schufeldt's departure was not due to bad press and/or franchisee outrage, rather a difference of opinion as to the direction the franchise should take. . . ." Pai Compl. ¶ 42; Fabbro Compl. ¶ 33.

In April 2013, DRX sold the assets, which include the Doctors Express franchising agreements, of the Doctors Express system to AFC Franchising LLC, a subsidiary of Defendant American Family Care, Inc. ("AFC").  Pai Compl. ¶¶ 12-13; Fabbro Compl. ¶¶ 9-10; Amolsch Decl. ¶ 3.  AFC is currently the franchisor of the Doctors Express franchises.

Plaintiffs' Allegations

In their complaints, the Pai Plaintiffs and Fabbro Plaintiffs rely upon identical allegations. First, they allege that NEXDRX1 and Fabbro relied on the FDD's representations of initial start-up costs and capital that the franchise deemed necessary to operate the franchise.   NEXDRX1's start-up costs, however, have allegedly exceeded $1 million, which is an amount nearly double the projections contained within the FDD.   Plaintiffs further believe that their business requires an additional $300,000 in capital infusion beyond this $1 million.   Plaintiffs also allege that the range of working capital projected by the FDD fails to include certain operating expenses, such as the salary of a Medical Director.  *See* Pai Compl. ¶¶ 20-25.  Fabbro's start-up costs have exceeded $820,000, which is an amount nearly forty percent over the projections contained within the FDD.   Plaintiffs also allege that the range of working capital projected by the FDD fails to include certain operating expenses, such as the salary of a Medical Director.  *See* Fabbro Compl. ¶¶ 12-17.  Plaintiffs point to the 2012 version of the FDD, which estimates start-up costs and working capital necessary to operate a Doctors Express franchise to be nearly double the amount estimated in the 2008 FDD, as an admission by DRX that its earlier estimates were too low.  Pai Compl. ¶ 28; Fabbro Compl. ¶ 19.

Plaintiffs also allege that when DRX owned the Doctors Express system, it "initiated material and system-wide changes, designating a vendor to provide required services as a mandatory contract, despite the fact that the contract increases Plaintiff's (and presumable others') costs on an annual basis of at least $30,000."  Pai Compl. ¶ 44; Fabbro Compl. ¶ 35. Plaintiffs also allege that DRX has refused to produce any audited financial statements, despite a formal request to provide such an accounting.  In particular, Plaintiffs allege that DRX promised them a fully audited financial statement pertaining to the allocation and spending of franchisee

advertising monies upon request at the annual franchise conference.  Pai Compl. ¶¶ 48-50; Fabbro Compl. ¶ 39-40.  DRX, however, has failed to prove an audited formal accounting but rather "disseminated a two-page unaudited 'summary' style document that fails to state, with particularity, the use and purpose of advertising monies collected from Plaintiffs and other franchisees."  Pai Comp. ¶ 51; Fabbro Compl. ¶ 42.

## II.   <u>Standard of Review</u>

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  When reviewing a motion to dismiss, courts must first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  All reasonable inferences must be made in the Plaintiff's favor.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

In order to survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).  When assessing the sufficiency of a civil complaint, a court must distinguish factual contentions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.  Any legal conclusions are "not entitled to the assumption of truth" by a reviewing court.  *Id*. at 679.  Rather, "[w]hile legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations." *Id. See also Fowler*, 578 F.3d at 210 (explaining that "a complaint must do more than allege a plaintiff's entitlement to relief").

Generally, the Court's task in assessing a motion to dismiss requires it to disregard any material beyond the pleadings. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). A district court may, however, consider the factual allegations within other documents, including those described or identified in the Complaint and matters of public record, if the plaintiff's claims are based upon those documents. *See id.* at 1426; *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (explaining that the court may properly consider the "complaint, exhibits attached to the complaint, matters of public record, as well as indisputably authentic documents if the complainant's claims are based upon these documents"). Furthermore, a court need not accept allegations as true that are contradicted by the documents upon which a party's claims are based. *See Warburton v. Foxtons, Inc.*, Civil Action No. 04-2474, 2005 U.S. Dist. LEXIS 39615, at *10 (D.N.J. June 13, 2005) (citing *Genesis Bio-Pharm., Inc. v. Chiron Corp.*, 27 F. App'x. 94, 99-100 (3d Cir. Jan. 10, 2002)). Accordingly, in resolving this motion, the Court shall consider the exhibits attached to the Declarations of Regina B. Amolsch ("Amolsch Decl.") and Chad A. Keetch ("Keetch Decl."), all of which either form the basis of Plaintiffs' claims or are referenced directly in the Complaint.[3]

## III.   Discussion

### A.   Count One of the Complaints

Plaintiffs first allege that Defendants DRX and AFC have constructively terminated their franchise without good cause in violation of the New Jersey Franchise Practices Act (the "NJFPA"), N.J.S.A. 56:10-5. Plaintiffs seek to "[p]reliminarily and permanently enjoin[]

---

[3] Plaintiffs do not dispute the authenticity of this, or any of the other documents, attached to the aforementioned declarations.

Defendants termination of Plaintiff's franchised business. . . ."  Pai Compl. ¶ 59(c); Fabbro

Compl. ¶ 59(c).  Because Plaintiffs have failed to properly allege a factual foundation necessary

to establish a claim for constructive termination, Count I of Plaintiffs' Complaints will be

dismissed.

The NJFPA is a remedial statute that has a general objective of "protecting franchisees

from the superior bargaining power of franchisors and providing swift and effective judicial

relief against franchisors that violate the Act."  *Kubis & Perszyk Assocs. v. Sun Microsystems*,

146 N.J. 176, 193 (1996); *see also* N.J.S.A. 56:10-2 (explaining that its purpose was to "protect

franchisees from unreasonable termination by franchisors that may result from a disparity of

bargaining power between national and regional franchisors and small franchisees").  Under the

statute, franchisees are protected against indiscriminate termination by providing that "[i]t shall

be a violation of this act for a franchisor to terminate, cancel, or fail to renew a franchise without

good cause."  N.J.S.A. 56:10-5.  "'Good cause' is defined as 'failure by the franchisee to

substantially comply with those requirements imposed upon him by the franchise.'"  *Maintainco,*

*Inc. v. Mitsubishi Caterpillar Forklift America, Inc.*, 408 N.J. Super. 461, 475 (App. Div. 2009)

(quoting N.J.S.A. 56:10-5).  The NJFPA only expressly limits a franchisor to not "impose

unreasonable standards of performance."  *Id.* (quoting N.J.S.A. 56:10-7(e)).

Here, Plaintiffs admit that both NEXDRX1 and Fabbro continue to operate as

franchisees, and there has been no steps taken by DRX or AFC to terminate the Franchise

Agreement.  *See* Pai Compl. ¶¶ 18, 52; Fabbro Compl. ¶¶ 11, 52.  Plaintiffs allege, however, that

Defendants have constructively terminated the Franchise Agreement by: (1) involving Dr.

Shufeldt with the Doctors Express system at a time when he was implicated in the investigation

of NextCare, his earlier employer; (2) "grossly understating" the initial investment and working

capital required to start and operate a Doctors Express franchise, including failing to include the cost of a Medical Director salary; (3) failing to account for the collection of franchise advertising monies; and (4) failing to "understand the law surrounding regulatory matters and its inducement of franchisees to abrogate the law."  *See* Pai Opp. Br. at 19; Pai Compl. ¶ 57; Fabbro Opp. Br. at 16; Fabbro Compl. ¶ 57.

The Supreme Court recently has made clear that a claim for constructive termination by a franchisee requires that a franchisee no longer be in operation.  In *Mac's Shell Service v. Shell Oil Prods. Co.*, 559 U.S. 175, 178 (2010), the Court found that a franchisee failed to state a claim for constructive termination under the Petroleum Marketing Practices Act—a federal statute that protects gas station franchisees—when "the franchisor's allegedly wrongful conduct did not compel the franchisee to abandon its franchise."  After analyzing the language of the PMPA, the Court found that "given its ordinary meaning, the text of the PMPA prohibits only that franchisor conduct that has the effect of ending a franchise."  *Id.* at 182.  The Court reasoned that requiring franchisees to abandon their franchise before claiming constructive termination was consistent with the general understanding of the doctrine of constructive termination, where "a plaintiff must actually sever a particular legal relationship" in order to state a claim.  *Id.*  After all, termination is considered "constructive" not because there is no end to the relationship, but because it is the plaintiff who formally puts an end to the particular legal relationship, as opposed to the defendant.  *Id.* at 185.   Here, the Pai Plaintiffs have alleged that NEXDRX1 is a current Doctors Express franchisee.  *See* Pai Compl. ¶ 52.  Likewise, the Fabbro Plaintiffs have alleged that Fabbro is a current Doctors Express franchisee.  Fabbro Compl. ¶ 52.  Both Plaintiffs are still continuing to operate their respective Doctors Express franchise at the same location, are still using the Doctors Express marks and system, and are continuing to generate revenue.  *See*

Pai Compl. ¶¶ 18, 57(c) (alleging that it is a franchisee "in good standing" and that recently gross revenues have surpassed operating costs); Fabbro Compl. ¶ 11, 57(c) (stating same).  Neither NEXDRX1 nor Fabbro therefore have "had the franchise 'terminate[d]' in either the ordinary or technical sense of the word." *Mac's Shell*, 559 U.S. at 184.

Plaintiffs have tried to overcome this hurdle by arguing that *Mac's Shell* should not apply at all here, essentially because it involves the PMPA rather than the NJFPA.   This is, as Defendants argue, a distinction without a difference.  Plaintiffs have asserted no reason why the statutes should be interpreted or applied differently, particularly where both statutes share the same purpose of protecting franchisees from termination without cause.  Indeed, at least one other federal court has held that the reasoning of *Mac's Shell* applies to a state statute, almost identical to the NJFPA, aiming to protect franchises.  *See Bell v. Bimbo Foods Bakery Distribution Inc.*, Case No. 11-C-3343, 2012 U.S. Dist. LEXIS 90987 (N.D. Ill. July 2, 2012).

Plaintiffs argue that a New Jersey appellate court decision that issued before the *Mac's Shell* decision, *Maintainco, Inc. v. Mitsubishi Caterpillar Forklift America, Inc.*, 408 N.J. Super. 461 (App. Div. 2009), stands for the proposition that a franchisee can state a claim for constructive termination under the NJFPA even if it is an operating franchise.  *See* Pai Opp. Br. at 20; Fabbro Opp. Br. at 17.  This argument is unpersuasive.  While the *Maintainco* Court did hold that claims for constructive termination exist under the NJFPA, the Court specified that such claims exist only in accordance with standard contract law.  *Maintainco*, 408 N.J. Super. at 478-79.  The inclusion of "constructive" termination was necessary under the NJFTA because any other conclusion "would undercut the remedial purposes of the Act by allowing a franchisor to engage in such blatant attempts to 'ditch,' or constructively terminate, a franchisee, but escape liability under the Act because it did not entirely succeed."  *Maintainco*, 408 N.J. Super. at 479.

Like the Supreme Court in *Mac's Shell*, the Court extracted its definition of constructive termination from general contract law, citing to principles of employment law establishing that a claim for constructive termination generally requires an employee to leave their job.  *See Maintainco*, 408 N.J. Super. at 478 (explaining that constructive termination "occurs when a reasonable employee feels compelled to resign because of an employer's conduct") (quoting *Daniels v. Mutual Life Ins. Co.*, 340 N.J. Super. 11, 17 (App. Div. 2001)).  *See also Muench v. Township of Haddon*, 255 N.J. Super. 288, 302 (App. Div. 1992) (explaining that constructive discharge occurs when conditions of employment become "so intolerable that a reasonable person subject to them would resign").

Further, a reading of *Maintainco* strongly infers that the franchisee would not have had a cause of action against the franchisor if not for the fact that the franchisee was essentially no longer able to operate the franchise.  To that regard, the case essentially is premised on the same theory as *Mac's Shell*; that is, constructive termination is part of traditional contract law principles, and requires that the franchisee no longer be operating the franchise.  This case, therefore, is inapposite to the allegations made by Plaintiffs.   Both Plaintiffs have alleged that their respective franchise is an operating franchise in good standing, and that their respective franchise has recently grossed enough revenue to cover its operating costs and apparently even earn a small profit.  Conversely, in *Maintainco*, the Court expressly found both that the franchisor had not only sent the franchisee a termination letter and that the franchisor was actively working to force the franchisee to resign—and, in fact, the only reason that the franchisor did not succeed in this attempt was because the franchisee filed the action, thereby preventing its termination.  *See* 408 N.J. Super. at 475, 480-81 (explaining that the defendant-franchisor intended to eliminate the plaintiff-franchisee as a car dealer).  There are no allegations

regarding any threat by Defendants to terminate either Plaintiffs' franchise or any intent to force

either Plaintiffs' franchise to "resign." *See id.* at 481. Therefore, this Court finds *Maintainco* to

be unpersuasive authority for the proposition that a franchisee that is currently operating,

accepting the benefits of the franchise, and making a profit can bring a claim for constructive

termination.

Based upon the Supreme Court's holding in *Mac's Shell*, a claim for constructive

termination requires that a franchisee no longer be operating.  Both Plaintiffs have alleged that

they are an operating franchisee of the Doctors Express franchise in good standing.  There are no

allegations that any of the Defendants have engaged in engaged in the sort of conduct that would

render either franchisee's situation so intolerable that they would be effectively forced to stop

operating their franchise.  There has been no termination, and therefore, there is nothing to

enjoin.  Therefore, Count I of both Plaintiffs' Complaints will be dismissed.

### B.      Counts Two and Three of the Complaints[4]

Counts Two and Three of Plaintiffs' Complaints seek rescission of the Franchise

Agreement for breach of both certain express terms and implied covenants of the Franchise

Agreement.  Because the complained-of conduct is authorized by the express terms of the

Franchise Agreement, Counts Two and Three must be dismissed.

First, Plaintiffs allege that the Franchise Agreement—a contract made at arm's length

between the franchisees and the franchisors—has been breached by the Defendants.

Specifically, Plaintiffs allege that "Defendants have grossly understated the original start-up

---

[4] In their Complaint, Plaintiffs rely on New Jersey law.  For some reason, in their opposition briefs, Plaintiffs now argue that Maryland law should apply to their common law claims.  It is well established that "where the laws of two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question."  *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006).  Because there is no single aspect of Maryland law that has been identified as differing from New Jersey law in any relevant way to this motion, this Court will avoid the choice-of-law question.

investment and operating costs required to own and operate a DEF franchise location."  Pai Compl. ¶ 62; Fabbro Compl. ¶ 62.  This is not a cognizable claim for a breach of the Franchise Agreement.  The estimate of the initial investment was contained in the FDD, which Plaintiffs "reviewed prior to executing a franchise contract with DEF."  Pai Compl. ¶ 20; Fabbro Compl. ¶ 12.  While Plaintiffs have alleged that their start-up and operating costs have far exceeded the amounts estimated within the FDD, the FDD unequivocally states that the costs included within it are estimates, and not to be considered a projection or promise of the actual costs of the franchise.  The FDD also clearly states that there are no currently operating franchised units, and the estimates are based only upon the single Doctors Express center that was in existence at the time, which was owned by an affiliate of DEF.  *See* Pai FDD at 14, 43, 44-46; Fabbro FDD at 13, 38-41.  It also reiterates that the actual terms of the contract between the parties are contained only within the Franchise Agreement.  *See* Pai FDD at i; Fabbro FDD at i.  Consequently, because the allegedly understated estimated costs for start-up and operation of the franchises were not contained or otherwise incorporated within the Franchise Agreements, Plaintiffs cannot validly state a claim for breach of contract premised on that basis.

However, even if they could state a claim, the claim would be time-barred.  The Franchise Agreement between the parties establishes that all claims between them "must be brought or asserted" within the earlier of one year of the discovery of the claim or two years after "the first act or omission giving rise to an alleged claim," or "such claims or actions shall be irrevocably barred."  Pai Compl. Ex. A at § 17.10; Fabbro Compl. Ex. A at § 17.10.  Despite Plaintiffs' arguments to the contrary, there is nothing improper with a contractual limitation period.  Under either New Jersey or Maryland law, parties to a contract may shorten the applicable statutory limitations period provided the shortened period is reasonable and does not

17

violate public policy.  *See A.J. Tenwood Assocs. v. Orange Senior Citizens Housing Co.*, 200

N.J. Super. 515, 523-24 (App. Div. 1985); *Coll. of Notre Dame of Md., Inc. v. Morabito*

*Consultants, Inc.*, 752 A.2d 265, 273 (Md. Ct. Spec. App. 2000).  In this case, the parties have

agreed to contractually limit the time in which a party may bring a suit in their Franchise

Agreement.  Any claims based on the estimates contained within the FDD would have arisen

when NEXDRX1 read the FDD, which occurred prior to the February 12, 2010 execution of the

Franchise Agreement.  The Pai Plaintiffs did not assert any such claim until May 20, 2013.

Likewise, the any claims based on the estimates contained within the FDD would have arisen for

the Fabbro Plaintiffs when they read the FDD, which occurred prior to the April 9, 2009

execution of the Franchise Agreement.  The Fabbro Plaintiffs did not assert any such claim until

April 22, 2013.  This claim would therefore be barred under the terms of the parties' agreed

limitations period.

Plaintiffs also allege that the Franchise Agreement was breached when Dr. Shufeldt

acquired and/or became the CEO of the Doctors Express system.  The Franchise Agreement,

however, expressly reserves the right of the franchisor to "change our ownership or form and/or

assign [the] Agreement and any other agreement to a third party without restriction" and

establishes the right to change officers or other personnel of the Doctors Express system.  Pai

Compl. Ex. A at § 12.1; Fabbro Compl. Ex. A at § 12.1.  Finally, Plaintiffs attempt to state a

claim for  breach of the Franchise Agreement with their allegation that DRX breached the

Franchise Agreement when it changed certain third-party vendors and changed the system

standards.  Once again, the Franchise Agreement soundly establishes the right of the franchisor

to change required vendors and, if it chooses to do so, the franchisee "agree[s] to purchase…only

from distributors and other suppliers we have approved. . . ."  *See* Pai Compl. Ex. A at § 8.3;

Fabbro Compl. Ex. A at § 8.3.  Under the Franchise Agreement, Plaintiffs also agreed that the franchisor "may modify the System Standards, and these modifications may obligate [the franchisee] to invest additional capital in the Franchised Business and/or incur higher operating costs." *Id.* at § 8.8.

Overall, the express terms of the Franchise Agreement have not been breached by any of Plaintiffs' allegations.  The Franchise Agreement does not address any initial investment amount, authorizes the franchisor to be sold and to change officers and other personnel, and authorizes the franchisor to change third-party vendors and suppliers and to modify the system standards even if it causes a franchisee to invest additional capital.  Because Plaintiffs have failed to cite to a single provision of the Franchise Agreement that has been breached, Count Two of Plaintiffs' Complaints must be dismissed.

Count Three of Plaintiffs' Complaints request a rescission of the contract based upon a breach of the implied covenant of good faith and fair dealing.  Plaintiffs allege that the covenant was breached when Doctors Express was affiliated with Dr. Shufeldt and when DRX changed the system standards.[5]  Under either New Jersey or Maryland law, this claim is meritless. Significantly, while Plaintiffs cite to Maryland law in their opposition briefs, "Maryland does not recognize a separate cause of action for breach of the implied duty of good faith and fair dealing." *Bowers v. Bank of Am., N.A.*, 905 F. Supp. 2d 697, 703 (D. Md. 2012).  While New Jersey does recognize a cause of action for breaching the covenant, the duty of good faith and fair dealing cannot be used to supersede the express terms of a valid contract.  *See, e.g.*, *Mylan Inc. v. SmithKline Beecham Corp.*, Civil Action No. 10-4809, 2012 U.S. Dist. LEXIS 23264, at

---

[5] Plaintiffs have also alleged that the covenant was breached when DRX constructively terminated the Plaintiffs. For reasons already stated, the franchisees were never constructively terminated.

*18 (D.N.J. Feb. 23, 2012); *Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 419 (1997).  Here, the complained-of conduct is contemplated and authorized under the Franchise Agreement.

Moreover, a claim for a breach of the implied covenant of good faith and fair dealing requires proof of bad motive or intention "because contract law does not require parties to act altruistically towards each other, and decisions that happen to result in economic disadvantage to the other party are of no legal significance." *DBA Distrib. Servs. v. All Source Freight Solutions, Inc.*, Civil Action No. 11-3901, 2012 U.S. Dist. LEXIS 33697, at *14 (D.N.J. Mar. 13, 2012) (internal quotations and citations omitted).  Plaintiffs' Complaints are void of any allegations of bad motive or intention.  Therefore, because Plaintiffs have failed to allege a cognizable claim for a breach of the implied covenant of good faith and fair dealing, Count Three must be dismissed.

### C.    Count Four of the Complaints

In Count Four, Plaintiffs have requested this Court to declare the post-termination covenant not to compete void and unenforceable.  Because this claim is not yet ripe, Count Four will be dismissed.

In order for a claim to be justiciable controversy, "[t]he conflict between the parties must be ripe for judicial intervention." *Wyatt v. Gov't of the V.I.*, 385 F.3d 801, 806 (3d Cir. 2004).  Specifically, "[a] dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* (internal quotation omitted).  Here, Plaintiffs are requesting this Court to declare the agreed-upon post-termination covenant not to compete between the parties to be void and unenforceable.  Plaintiffs, however, have not alleged any plan to compete, nevertheless a plan to compete in a way that would violate the covenant.  Plaintiffs argue in their opposition brief that they "affirmatively seek in Count One

of their complaint to rescind the parties' franchise agreement."  Pai Opp. Br. at 32-33; Fabbro

Opp. Br. at 30.  This is simply not true.  In Count One of their Complaint, Plaintiffs have

requested this Court to enjoin the "constructive termination" of the Franchise Agreement, not to

rescind it.  *See* Pai Compl. ¶ 59(c); Fabbro Pai Compl. ¶ 59(c).  Plaintiffs cannot rewrite their

pleadings in an opposition brief.  *See Frederico v. Home Depot*, 507 F.3d 188, 201-02 (3d Cir.

2007).  Because this claim depends on future events that may or may not occur, this claim is not

ripe for adjudication.  *See Alboyacian v. BP Prods. N. Am.*, Civil Action No. 9-5143, 2011 U.S.

Dist. LEXIS 134453, at *5-6 (D.N.J. Nov. 22, 2011).

### D.    Count Five of the Complaints

Plaintiffs have demanded a formal audited accounting in Count Five, claiming that they

are entitled to an audited accounting under Section 9.2 of the Franchise Agreement.  Despite this

allegation, the Franchise Agreement clearly states that the franchisor has an obligation to provide

an *unaudited* report.  Specifically, the Franchise Agreement provides:  "We will prepare an

annual, unaudited statement of Marketing Fund collections and expenses.  This statement is

available for your review upon written request, ninety (90) days after our fiscal year."  Pai

Compl. Ex. A at § 9.2; Fabbro Compl. Ex. A at § 9.2  There is no allegation that any Defendants

breached this duty; rather, the Complaint alleges that DRX has provided an unaudited document,

which is the extent to what it was obligated to provide under the terms of the agreed-upon

Franchise Agreement.  *See* Pai Compl. ¶ 89; Fabbro Compl. ¶ 89.   Therefore, Plaintiffs' demand

for an audited accounting per the terms of the Franchise Agreement is meritless and will be

dismissed.

E.        **Counts Six and Seven of the Complaints**

Plaintiffs have brought two claims for damages based upon alleged misrepresentations arising out of the projections of the initial costs and working capital provided to NEXDRX1 or to Fabbro in the FDD.  As a threshold issue, these claims are time-barred under the contractually agreed upon limitations period.  As discussed, both NEXDRX1 and Fabbro agreed in the Franchise Agreement to bring or assert "any and all claims and actions arising out of or relating to this Agreement" within the earlier of one year of the discovery of the claim or two years after the act giving rise to the claim.  Pai Compl. Ex. A at § 17.10; Fabbro Compl. Ex. A at § 17.10. This contractual limitations period makes no distinction between tort and contract claims, but rather applies to "all" claims relating to the Franchise Agreement.  The Pai Plaintiffs' allegations under both Counts Six and Seven occurred prior to NEXDRX1 signing the Franchise Agreement on or about February 12, 2010 and were not asserted until May 20, 2013.  Likewise, the Fabbro Plaintiffs' allegations occurred prior to Fabbro signing the Franchise Agreement on or about April 9, 2009, and were not asserted until April 9, 2009.  These claims are therefore barred.

Further, neither the 2008 nor 2009 FDD were prepared or distributed by the Defendants. Rather, each FDD was prepared by DEF.  DEF is not a party to either matter.  Any alleged misrepresentations contained within the FDD cannot, therefore, be attributed to any of the Defendants.  Where allegedly fraudulent statements were not made by a defendant to the case, but rather were made by a third-party, the defendants cannot be liable.  *See Nat'l Enters. v. Wong & Fleming*, Civil Action No. 11-4756, 2012 U.S. Dist. LEXIS 44891, at *17-18 (D.N.J. Mar. 30, 2012) (entering judgment for the defendants on fraud and negligent misrepresentation claims where "none of Defendants are alleged to have made or been responsible for those statements, and [plaintiff] has provided no evidence that Defendants participated in or had knowledge of any

of the alleged misrepresentations").  Therefore, Plaintiffs cannot state a claim against Defendants

for an alleged misrepresentation, when such misrepresentations were made by a third-party.

Finally, even if the claims were otherwise cognizable, Plaintiffs' claims for either fraud

or negligent misrepresentation fail regardless.  Under both New Jersey and Maryland law, an

action for either common law fraud or negligent misrepresentation must be predicated on a

statement of present or past fact.  Predictions of future events are not actionable.  *See Baer v.

Chase*, Civil Action No. 02-2334, 2004 U.S. Dist. LEXIS 3954, at \*30-31 (D.N.J. Feb. 20,

2004); *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1997) ("Statements as to future

or contingent events, to expectations or probabilities, or as to what will or will not be done in the

future, do not constitute misrepresentations, even though they may turn out to be wrong.");

*Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 738 F. Supp. 2d 640, 651 (D.

Md. 2010).  In this case, Plaintiffs' claims for misrepresentations are based upon the estimates

made by DEF in its FDD of the future initial costs and working capital.  *See* Pai Compl. ¶¶ 97-

98, 102; Fabbro Compl. ¶¶ 97-98, 102.  Plaintiffs have also alleged that certain oral

representations were made to them regarding start-up costs in addition to those in the FDD.  *See*

Pai Compl. ¶¶ 23-24; Fabbro Compl. ¶¶ 15-16.  Such estimates are not actionable because they

relate to future events.   In their opposition brief, Plaintiffs attempt to argue that Defendants

knew that the estimates were false because the estimates in the FDD were "grossly inaccurate,"

and therefore they have stated a claim for fraud and negligent misrepresentation.  *See* Pai Opp.

Br. at 31; Fabbro Opp. Br. at 28.  Plaintiffs, however, have alleged no facts in the Complaint that

the initial cost estimates were inaccurate at the time they were made or that the Defendants

believed or knew the estimates to be false.

Finally, a claim for either fraud or negligent misrepresentation requires that a party reasonably relied upon the misrepresentation. *See Cigna*, 991 F. Supp. at 435-36, 440-41; *Kuechler v. Peoples Bank*, 602 F. Supp. 2d 625, 634 (D. Md. 2009). The FDD expressly states that the estimates contained within it came from a single Doctors Express center that was owned by a DEF affiliate. It also states that there were no currently operating franchised units. The FDD warns the potential franchisee that "your costs will depend on a number of factors including local economic and market conditions" and that the financial performance representations "should not be considered a representation or guaranty." Pai FDD at 14, 43; Fabbro FDD at 13, 41. Plaintiffs could not have reasonably relied on these estimates that were based on a company-owned unit in Maryland, particularly when the FDD disclosed that the estimates were not necessarily the costs that the individual franchisee would incur.

Therefore, for any number of reasons,[6] Counts Six and Seven of Plaintiffs' Complaint must be dismissed.

### F.      Count Eight:  Maryland Franchise Registration and Disclosure Law

In Count Eight, Plaintiffs have alleged a violation of the Maryland Franchise Registration and Disclosure Law, Md. Code §§ 14-201 *et seq.*, which regulates the sale of franchise sold by means of untrue statements or omissions. *See id.* § 14-227. This claim also must be dismissed.

First, the terms of the statute creates civil liability to "[a] person who sells or grants a franchise." *Id.* In their Complaint, Plaintiffs allege that DRX made untrue statements of material fact "[i]n connection with the sale of a Doctor's Express franchise to Plaintiffs." Pai Compl. ¶ 104; Fabbro Compl. ¶ 104. DRX, however, did not sell or grant the Doctors Express franchise to Plaintiffs. Neither was AFC. Rather, it was DEF that sold the franchise to

---

[6] Plaintiffs' fraud claim also fails far short of the heightened pleading requirement necessary under Fed. R. Civ. P. 9(b). *See Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004).

Plaintiffs.  DEF is not a party to this case.  Furthermore, the allegations in this case relate to the estimate of the initial investment as provided in the FDD.  As just discussed, these estimates of future events cannot be considered "untrue statement[s] of material fact[s]."  Md. Code § 14-227(a)(1)(ii).

Finally, this claim is time-barred.[7]  The statute provides that "[a]ny action under this section must be brought within 3 years after the grant of the franchise."  *Id.* at § 14-227(e).  Here, the sale of the franchise to the Pai Plaintiffs occurred in February 2010.  The Pai Plaintiffs did not assert a claim under the statute until May 2013.  The sale of the franchise to the Fabbro Plaintiffs occurred in April 2009, and the Fabbro Plaintiffs did not assert a claim under the statute until April 2013.  Therefore, Plaintiffs' claim is untimely, and is barred.

## IV.    <u>Conclusion</u>

Here, Plaintiffs' Complaints read as a lament for what they now consider have been a poor business decision.  While this realization may be unfortunate for the Plaintiffs, their complaints fall short of stating any viable legal claim against Defendants.  Therefore, for the reasons stated above, Defendants' motions to dismiss in both cases are granted.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano      
JOEL A. PISANO, U.S.D.J.

Dated: March 4, 2014

---

[7] Under Maryland law, a contractual limitation period cannot shorten a statutory limitation period.  *See Morabito Consultants*, 752 A.2d at 273.